IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA

| | |
|---|---|
| Slawson Exploration Company, Inc., | ) |
| Plaintiff, | ) **ORDER GRANTING THE** |
| vs. | ) **DEFENDANT'S MOTION FOR** |
| | ) **SUMMARY JUDGMENT** |
| Nine Point Energy, LLC f/k/a | ) |
| Triangle USA Petroleum Corporation, | ) Case No. 1:17-cv-106 |
| Defendant. | ) |

Before the Court are Slawson Exploration Company, Inc.'s ("Slawson Exploration") motion for partial summary judgment and Nine Point Energy, LLC's ("Nine Point") motion for summary judgment. Slawson Exploration filed its motion for partial summary judgment on March 2, 2018. See Doc. No. 24. Nine Point filed its cross-motion for summary judgment on the same date. See Doc. No. 29. The parties have fully briefed both motions. For the following reasons, the Court grants Nine Point's motion for summary judgment.

I. **BACKGROUND**

Slawson Exploration brought this diversity action for declaratory judgment on May 24, 2017. Slawson Exploration is a Kansas corporation with its principal place of business in Wichita, Kansas. Nine Point is a Delaware limited liability company with a single member, Nine Point Energy Holdings, Inc., which is a Delaware corporation with its principal place of business in Denver, Colorado. The case derives from a decision by the United States Bankruptcy Court for the District of Delaware to defer deciding whether a provision in an oil and gas contract runs with the land under North Dakota law. Slawson Exploration claims Nine Point owes it payments based

on a provision in an oil and gas development agreement Slawson Exploration made with Nine Point's predecessor. The parties have framed the question before the Court to be whether the provision constitutes: (1) an interest in real property; (2) a covenant running with the land; or (3) an equitable servitude. Slawson Exploration estimates payments based on the provision to total approximately $25,100,000. After an exhaustive consideration of the matter, the Court concludes the provision in question does not fall within any of the above categories.

In 2010, Slawson Exploration and Triangle Petroleum Corporation ("Triangle") entered into a contract titled "Exploration and Development Agreement with Area of Mutual Interest" ("EDA"). See Doc. No. 1-1. The EDA defined a project area, referred to as "Project X," in Williams and McKenzie Counties, North Dakota. At the time of the agreement, Slawson Exploration held leasehold interests in the Project X area; Triangle did not. According to the EDA's recitals, Slawson Exploration was "seeking partners to jointly acquire additional undeveloped leasehold interests in the Project Area," and Triangle "wish[ed] to participate with [Slawson Exploration] in evaluation, leasing, drilling, and development of the Project Area." The EDA provided the terms for their venture. The EDA was to be governed by Colorado law, "except with respect to substantive oil and gas and real property matters, which shall be governed and construed in accordance with the laws of the state of North Dakota." See Doc. No. 1-1, p. 5.

Pursuant to the EDA, Slawson Exploration agreed to sell 30% of its oil and gas leasehold interests in the project area to Triangle. In addition to paying a per acre price, Triangle agreed to pay Slawson Exploration "an amount equal to 10 percent" of Triangle's share of costs to drill and complete Project X wells for which it opted to participate.[1] This obligation to tender payment

---

[1] Oil and gas leasehold interests are often pooled into units of standard size. Lessees may opt to participate in the drilling of a well within the unit—i.e., share in the expenses incurred by the other well participants. See generally Summers Oil and Gas §§6:1-6:9 (3d ed. 2018).

2

based on drilling and completion costs is at the heart of the controversy. The parties refer to it as the "Promote Obligation" or the "10% Promote."

The EDA also contained a provision titled "AMI," which is an abbreviation for "area of mutual interest." This provision is expressly noted in the title of the EDA agreement—i.e., "Exploration and Development Agreement *with Area of Mutual Interest*." The relevancy of this provision to the dispute will become apparent later. In short, the parties disagree as to whether the area of mutual interest ("AMI") provision's inclusion, as well as the term's use in the broader agreement's title, affect the legal classification of the Promote Obligation. Under the AMI provision, the parties agreed they would offer any leasehold interest they acquired in the project area, at cost, in the proportion that each party owned under the EDA—i.e., 70% for Slawson Exploration and 30% for Triangle. Unlike the EDA, which was to last "for the term of each leasehold interest and any extension or renewal," the area of mutual interest provision had a fixed two-year term.

Although Triangle acquired 30% of Slawson Exploration's interests in the project area, Slawson Exploration retained title to the interests and held them in trust for Triangle. In March of 2011, Triangle purchased Slawson Exploration's 70% interest in certain Project X leases in Williams County. Slawson Exploration made two assignments to Triangle. The first conveyed Slawson Exploration's 70% interest. See Doc. No. 27-1. The second assignment conveyed the 30% interest Slawson Exploration was holding in trust for Triangle. See Doc. No. 27-2. The second assignment stated the EDA "shall control in the event of any inconsistency with this Assignment." It also stated "the covenants and conditions hereof . . . shall be covenants running with the oil and gas leases." Slawson Exploration later made additional partial assignments of Project X leasehold interests to Triangle, all of which were subject to the EDA and contained

3

language stating Slawson Exploration "is entitled to and does hereby specifically retain and reserve . . . the right to receive from [Triangle and its] successors and assigns, an amount equal to ten percent (10%) of the cost attributable to the interest assigned hereunder, of the drilling and completion costs for any and all wells drilled on the Subject Leases." See Doc. Nos. 27-3, 27-4, 27-5, 27-6, and 27-7.

In April of 2012, Triangle began conveying its interests in the Project X leases to its wholly owned subsidiary, Triangle USA Petroleum Corporation ("TUSA"). See Doc. No. 1-13. On June 29, 2016, TUSA filed a petition for Chapter 11 bankruptcy. Slawson Exploration filed a proof of claim seeking payment, pursuant to the Promote Obligation, on all wells TUSA elected to participate after TUSA filed its bankruptcy petition. The proof of claim stated:

> Debtor may owe Slawson Exploration 10% Payments for wells that will be drilled in the future in leases subject to the Agreements, including Debtor's planned wells, and the estimated value of those future 10% Payments could be up to approximately $25,100,000.

See Doc. No. 31-1, p. 9. Nine Point emerged from confirmation of the bankruptcy plan. The Bankruptcy Court's confirmation order gave Slawson Exploration leave to commence litigation in North Dakota to determine whether the Promote Obligation runs with the land under North Dakota law:

> Nothing in this Confirmation Order or the Plan shall constitute a determination of the rights and obligations of the Debtors, the Reorganized Debtors, and Slawson Exploration . . . pursuant to that certain Exploration Development Agreement with Area of Mutual Interest . . . by and between Slawson Exploration and [Triangle], including, without limitation, whether the [Promote Obligation] constitutes a covenant running with the land under applicable non-bankruptcy law. . . . Slawson Exploration may commence a declaratory-judgment action or other appropriate proceeding in North Dakota state court or another court of competent jurisdiction and proper venue seeking a determination whether the Promote Obligation runs with the land. . . . In the event a court of competent jurisdiction concludes that the Promote Obligation constitutes an *in personem* Claim against the Debtors, it shall be subject to full and final satisfaction, settlement, release, and discharge pursuant

4

> to . . . the Plan to the same extent as any other pre-petition unsecured claim of the same Class.

See Doc. No. 1, pp 13-14.

Slawson Exploration brought this suit against Nine Point for declaratory judgment on May 24, 2017. Slawson Exploration asserts the Promote Obligation should be classified as a real property interest that binds successors. Slawson Exploration argues the Promote Obligation falls into at least one of the following real property interest categories: (1) a real covenant running with the land; (2) a free-standing real property interest; or (3) an equitable servitude. The Court concludes the Promote Obligation is personal in nature and does not fall within any of these categories.

## II.     STANDARD OF REVIEW

Summary judgment is appropriate when the evidence, viewed in a light most favorable to the non-moving party, indicates no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law. Davison v. City of Minneapolis, 490 F.3d 648, 654 (8th Cir. 2007); see also Fed. R. Civ. P. 56(a). Summary judgment is not appropriate if there are factual disputes that may affect the outcome of the case under the applicable substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A genuine issue of material fact is not the "mere existence of some alleged factual dispute between the parties." State Auto Ins. Co. v. Lawrence, 358 F.3d 982, 985 (8th Cir. 2004). Rather, an issue of material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248. The moving party always bears the burden of demonstrating the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The non-moving party may not rely merely on allegations or denials; it must set out specific facts showing a genuine issue

for trial.  Forrest v. Kraft Foods, Inc., 285 F.3d 688, 691 (8th Cir. 2002).  The court must view the facts in the light most favorable to the non-moving party.  Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970).

### III. **WHETHER THE PROMOTE OBLIGATION IS A REAL COVENANT**

Covenants concerning property are either real or personal.  A covenant that benefits the grantor personally "and serves no real benefit to the land" is a personal covenant.  Beeter v. Sawyer Disposal LLC, 771 N.W.2d 282, 286 (N.D. 2009).  Personal covenants are not inherently binding on successors to real estate.  Id.  On the other hand, real covenants are "appurtenant" to real property and are "said to run with the land" and bind successors.  N.D. Cent. Code § 47-04-24. Real covenants are defined by statute in North Dakota.  Id.  A covenant must be "made for the direct benefit of the property" to run with the land and bind successors.  N.D. Cent. Code § 47-04-26; see also Beeter, at 286 ("if a covenant contained in a deed does not directly benefit the land as required by N.D.C.C. § 47-04-26, it is personal and enforceable only between the original parties to the deed.").  Slawson Exploration claims the "Promote Obligation" benefits the land by spreading risk and facilitating development of the leasehold.[2]  Nine Point disagrees.  It argues the Promote Obligation is categorically not a real covenant under North Dakota law because it is an area of mutual interest[3] covenant and also because it constitutes consideration for the purchase of real property.

---

[2] "Oil and gas leases are interests in real property in North Dakota." Kittleson v. Grynberg Petroleum Co., 876 N.W.2d 443, 450 (N.D. 2016).
[3] "In general, the AMI is a contract to offer an option in future acquired leasehold or mineral interests within a particular geographic area." See e.g. Andrew Scott Graham, *Real or Personal?: the Area of Mutual Interest Covenant in the Williston Basin after Golden v. SM Energy Company*, 89 N.D. L. Rev. 241, 243 (2013).

## A. WHETHER AMI COVENANTS ARE CATEGORICALLY BARRED FROM CLASSIFICATION AS REAL COVENANTS IN NORTH DAKOTA

Nine Point characterizes the Promote Obligation as an "AMI Covenant" and asserts such covenants "categorically do not run with the land under North Dakota law." See Doc. No. 41, p. 2. Nine Point relies on *Spring Creek Exploration & Production Co., LLC v. Hess Bakken Investment II, LLC*, a case where the federal district court for the District of Colorado concluded that, if faced with the issue, "the North Dakota Supreme Court would find that AMI agreements are personal covenants that do not run with the land." No. 14-cv-00134, 2016 WL 9735145, at *8 (D. Colo. Sept. 8, 2016) aff'd, 887 F.3d 1003 (10th Cir. 2018). Slawson Exploration takes issue with Nine Point's characterization of the Promote Obligation as an AMI covenant. In Slawson Exploration's words, "the AMI provision in the EDA . . . could be severed from the EDA and the 10% Promote would stand." See Doc. No. 40, p. 3. Slawson Exploration also argues that, to the extent *Spring Creek* holds AMI covenants are categorically personal in North Dakota, such a holding is a misstatement of the law.

*Spring Creek* dealt with an agreement in which one party promised to pay an overriding royalty on leases it acquired in an area in Williams County, North Dakota, in exchange for a promise by other parties not to compete—i.e., acquire any other interest—in that area. 2016 WL 9735145, at *8. One issue in the dispute was whether the AMI agreement constituted a real covenant running with the land under North Dakota law. Id. at *7-8. The district court analyzed *Golden v. SM Energy Co.*, 826 N.W.2d 610 (N.D. 2013), a case where the North Dakota Supreme Court was tasked with determining whether an AMI agreement bound a successor in interest. Id. However, the *Golden* litigants had stipulated their AMI agreement was a personal covenant that did not run with the land. Golden, at 615. Given this stipulation, the North Dakota Supreme Court analyzed the case under the law of assignments. Id. *Golden* has generated speculation on the issue

7

of whether AMI agreements are considered real or personal covenants in North Dakota, but it did not expressly decide the matter.[4]

The Colorado federal district court concluded that, by adopting the *Golden* litigants' stipulation that the AMI agreement was a personal covenant, the North Dakota Supreme Court implied all AMI agreements are personal covenants that do not run with the land. Spring Creek, 2016 WL 9735145 at *8 ("Although *Golden* did not expressly hold that all area of mutual interest agreements are personal covenants, such [a] finding is a necessary implication of the North Dakota Supreme Court's holding."). The Tenth Circuit Court of Appeals agreed, noting: "we find it instructive that the [*Golden*] court's opinion did not indicate any reluctance to accept the parties' stipulation. And no justice wrote separately to caution that the issue remains unresolved." 887 F.3d at 1029.

This Court is not convinced *Golden* settled the matter by creating a universal rule. The issue of how to classify the AMI covenant in *Golden* was not before the North Dakota Supreme Court because of the parties' stipulation. Moreover, and as a more practical matter, there is no standard form AMI agreement.[5] Parties may negotiate different forms of AMI agreements with different terms.[6] It is unlikely the North Dakota Supreme Court would create a blanket rule treating

---

[4] Compare Graham, *supra* note 3, at 244 ("following *Golden*, assignees of mineral or leasehold title cannot foreclose the possibility than an AMI can exist as a real covenant in North Dakota") with Scott Lansdown, *Golden v. SM Energy Company and the Question of Whether an Area of Mutual Interest Covering Oil and Gas Rights is Binding on Successors and Assigns*, 89 N.D. L. Rev. 267, 294 (2013) ("It is safe to say that *Golden* confirms that in North Dakota an AMI will generally not be deemed a covenant running with the land").

[5] Lansdown, *supra* note 4, at 271. (discussing different types of AMI Agreements and noting "there is no standard 'model form' of AMI, and there is a wide variety in the types of AMI agreements.").

[6] See John S. Lowe, *Analyzing Oil and Gas Farmout Agreements*, 41 Sw. L.J. 759, 844 (1987) "An AMI provision gives [the parties] the right to share in interests acquired by the other in a designated contract area . . . *upon agreed terms*.") (emphasis added).

all provisions in every AMI agreement the same simply based on the title of the agreement or covenant.[7]

The requirements for real covenants are codified in North Dakota. See N.D. Cent. Code § 47-04-25; see also Spring Creek, 887 F.3d at 1027 ("Covenants that run with North Dakota land are defined by statute."). The more-workable approach is to examine the specific covenant in question and determine if it meets the statutory requirements.[8] The Court will apply that approach to the Promote Obligation, but it first turns to Nine Point's other categorical argument—that any covenant constituting consideration for the purchase of real property is barred from being a real covenant in North Dakota.

      **B.    WHETHER COVENANTS CONSTITUTING CONSIDERATION FOR THE PURCHASE OF REAL PROPERTY ARE CATEGORICALLY BARRED FROM CLASSIFICATION AS REAL COVENANTS IN NORTH DAKOTA**

Nine Point asserts there is a "well-established" and "absolute" rule in North Dakota "that consideration for land is a personal covenant that does not run with the land." See Doc. No. 41, p. 6. According to Nine Point, "the North Dakota Supreme Court has already decided that so long as a covenant is deemed to be consideration it is *ipso facto* a personal covenant, regardless of whatever other putative effects it may have on the land." Id.

The case Nine Point relies on is *Beeter v. Sawyer Disposal LLC*, 771 N.W.2d 282 (N.D. 2009). Property containing a landfill was conveyed by warranty deed. Id. at 284. The warranty

---

[7] Indeed, even if the parties themselves call an agreement a "real covenant" that does not make it such: "The rule is settled that regardless of the intention of the parties, a covenant will run with the land . . . only if the covenant complies with certain legal requirements." Beeter, 771 N.W.2d at 286 (internal quotation omitted).

[8] The *Spring Creek* court acknowledged this much in its opinion: "North Dakota law treats AMI covenants as it would any other covenant, as Plaintiffs themselves acknowledge. See Aplt. Reply Br. at 19 ('The North Dakota Supreme Court would look to the North Dakota statutes on covenants running with the land . . . to decide this issue . . . .')." (alteration in original). 887 F.3d at 1029.

9

deed included a covenant requiring the grantee and its successors to pay the grantor perpetual payments based on revenues generated from waste disposal on and around the property. Id. The deed contained language stating the covenant "is perpetual and a covenant running with the real estate." Id. A successor owner refused to pay the grantor, and the grantor sued the successor owner. Id. The North Dakota Supreme Court ultimately decided the covenant did not run with the land:

> The covenant in the deed in this case requiring payment of six percent of gross revenues from waste disposal operations does not in any manner benefit the land. It is a purely personal benefit to the [grantor] and appears, in fact, to be part of the consideration and payment for the land. The district court correctly concluded that the covenant did not benefit the land and did not run with the land.

Id. at 286. The *Beeter* court recognized that, under North Dakota's statutory scheme, a real covenant must have a direct benefit to the property. Id. ("if a covenant contained in a deed does not directly benefit the land as required by N.D.C.C. § 47-04-26, it is personal"). The North Dakota Supreme Court then concluded the covenant at issue "does not in any manner benefit the land." Id. The court's comment that the covenant "appears, in fact, to be part of the consideration" does not support Nine Point's sweeping assertion that any covenant constituting real property is "*ipso facto* a personal covenant." See Doc. No. 41, p. 6.

### C. WHETHER THE "PROMOTE OBLIGATION" MEETS NORTH DAKOTA'S STATUTORY REQUIREMENTS FOR REAL COVENANTS

Under North Dakota's statutory scheme, a covenant must be "made for the direct benefit of the property" to be a real covenant that binds successors in North Dakota. N.D. Cent. Code § 47-04-26; see also Beeter, 771 N.W.2d at 286 ("if a covenant contained in a deed does not directly benefit the land as required by N.D.C.C. § 47-04-26, it is personal and is enforceable only between the original parties to the deed"). The Promote Obligation is a promise by Triangle to pay Slawson

Exploration "an amount equal to 10 percent" of Triangle's drilling costs for Project X wells in which Triangle elects to participate. See Doc. No. 1-1, p. 2. Slawson Exploration claims this promise was made for the direct benefit of the leasehold. Slawson Exploration reasons that the Promote Obligation spreads cost, and cost spreading increases the likelihood that drilling operations will take place. According to Slawson Exploration's logic, because drilling operations constitute improvements to the leasehold, the Promote Obligation was made for the direct benefit of the property.

Slawson Exploration claims *Wheeler v. Southport Seven Planned Unit Development* supports its argument. 821 N.W.2d 746 (N.D. 2012). Slawson Exploration notes *Wheeler* "treated a covenant to pay money for improvements, repairs, or maintenance to real property as providing a direct benefit to the property as a matter of law." See Doc. No. 38, p. 4. In *Wheeler*, the North Dakota Supreme Court upheld a district court's decision that a homeowners' association had authority to charge assessments for lawn care and snow removal based on a covenant in a planned unit development declaration. Wheeler, at 755. Slawson Exploration likens the Promote Obligation to the covenant in *Wheeler*.

Slawson Exploration's argument is unconvincing. The Promote Obligation is not a promise to pay for the development or maintenance of property; it is a promise to pay Slawson Exploration "an amount equal to 10 percent" of Triangle's share of drilling costs. To be clear, the Promote Obligation is not payable to Slawson Exploration based on expenses Slawson Exploration incurs developing the property as the drilling operator. Slawson Exploration is entitled to the Promote Obligation even when another party drills and operates the well. See Doc. No. 25, pp. 7-8 (explaining Slawson Exploration was unable to calculate the Promote Obligation payments Triangle owed for wells operated by third parties after assignments were made to Triangle because

11

those operators communicated directly with Triangle). Slawson Exploration suggests the savings it recoups from the Promote Obligation's cost-shifting allows it to drill additional wells and further develop the property, but there is clearly no requirement for Slawson Exploration to allocate its savings in such a manner. The Promote Obligation is distinct from the covenant in *Wheeler* to pay for lawn care or snow removal.

The Promote Obligation is better characterized as a contractual term negotiated by the parties in contemplation of their economic interests and positions—i.e., a personal covenant. As Slawson Exploration has noted, the Promote Obligation constituted consideration paid to Slawson Exploration, and it "facilitated Triangle's ability to obtain a large leasehold position by allowing it to pay a portion of its acquisition costs as wells were drilled, lowering its barrier to entry." See Doc. No. 25, pp. 18-19. Because the Promote Obligation was not "made for the direct benefit of the land," the Court finds the Promote Obligation does not satisfy the requirements for real covenants in North Dakota. See N.D. Cent. Code 47-04-26.

IV. **WHETHER THE PROMOTE OBLIGATION IS A REAL PROPERTY INTEREST**

Slawson Exploration also asserts the Promote Obligation is a real property interest carved out of the various leasehold estates it assigned to Triangle. The North Dakota Supreme Court has rejected a similar "novel theory." See Beeter, 771 N.W.2d at 287. In *Beeter*, the facts of which are discussed above, the grantor argued the covenant at issue—a perpetual payment based on revenues generated by waste disposal on the subject property—could be treated as a royalty interest. Id. The North Dakota Supreme Court declined the grantor's "invitation to recognize a new property right in the nature of a royalty interest." Id. The Court explained:

> The Beeters have not cited a single case holding that a similar percentage payment included in a covenant in a deed was enforceable against subsequent purchasers as a royalty interest, perpetual rent, ground rent, or profit a prendre. The Beeters invite

12

> us, however, to create a new real property right recognizing a party's interest in collecting payments under such a covenant. The Beeters are simply trying to force this "square peg" deed covenant into "round hole" theories in an attempt to bind Sawyer, when the dispositive issue is whether it is a covenant which runs with the land. It is not, and the Beeters' attempt to "shoehorn" this fact situation into other inapplicable legal theories is unavailing.

Id. at 287. The logic Slawson Exploration relies on—that the Promote Obligation is akin to an overriding royalty interest—has thus already been rejected by the North Dakota Supreme Court. Perpetual percentage-based fees paid as consideration are not a recognized property interest in North Dakota. Slawson Exploration's argument fails.

### V. WHETHER THE "PROMOTE OBLIGATION" IS AN EQUITABLE SERVITUDE

Slawson Exploration also argues "at minimum" the Court should enforce the Promote Obligation as an equitable servitude. North Dakota has no case law expressly recognizing equitable servitudes, and the state's statutory scheme only mentions the term, in passing, in the context of condominium developments.[9] This is unsurprising, as the distinction between real covenants and equitable servitudes has eroded. The Restatement (Third) of the Law of Property (Servitudes) has done away with both terms because the distinctions between them have been reduced over time "to the point where they made little difference . . . ." § 1.4 (Am. Law Inst. 2000).

> Because continued use of the terms "real covenant" and "equitable servitude" perpetuates the idea that there is a difference between covenants at law and in equity, which at best tends to generate confusion, and at worst may lead lawyers and judges to focus on irrelevant questions or reach erroneous results, those terms have been dropped in this Restatement in favor of the term "covenant running with land."

Id.

---

[9] Under N.D. Cent. Code § 47-04.1-04, a condominium declaration "shall be [an] enforceable equitable servitude[] where reasonable."

Nine Point asserts the remedy of an equitable servitude, even if available in North Dakota, is inapplicable because equitable servitudes still must touch and concern the land. The Court agrees. For covenants to be enforced in equity, it is "generally agreed . . . that the covenants must concern the land or its use in a direct, and not a collateral way, and that the subsequent grantee must have notice of the covenant, either actual or constructive." 20 Am. Jur. 2d <u>Covenants, Conditions, and Restrictions</u> § 45; <u>see</u> <u>also</u> John E. Cribbet & Corwin W. Johnson, <u>Principles of the Law of Property</u> 383 (3d ed. 1989) ("Promises do not become real covenants or equitable servitudes unless they 'touch and concern' the estates in land to which they are sought to be attached."). The basis for the touch and concern requirement has been described as follows:

> The purpose of this requirement is said to be to prevent the serious restraint on alienability of land that might occur if landowners could impose upon subsequent owners obligations totally unrelated to the land of either party. If there were no touch and concern requirement, a grantor of land could, for example, aid the grantor's favorite charity by obtaining for the grantee a covenant expressly binding the grantee and the grantee's successors to contribute sums of money annually forever to that charity.

Cribbit & Johnson, <u>supra</u>, at 383. As the Court has explained, the Promote Obligation is best characterized as a contractual term negotiated by the parties in contemplation of their economic interests. The Court declines Slawson Exploration's invitation to apply equitable principles of property law to this type of personal obligation.

## VI. <u>**CONCLUSION**</u>

The Court has carefully reviewed the entire record, the parties' filings, and the relevant law. Suffice it to say there is scant case law in North Dakota or elsewhere that specifically addresses the complex legal issues presented in this civil dispute. For the reasons set forth above,

Plaintiff Slawson Exploration's motion for partial summary judgment (Doc. No. 24) is **DENIED**.

Defendant Nine Point's motion for summary judgment (Doc. No. 29) is **GRANTED**.

**IT IS SO ORDERED**

Dated this 8th day of April, 2019.

*/s/ Daniel L. Hovland*
Daniel L. Hovland, Chief Judge
United States District Court